May it please the Court. Good morning, Your Honors. My name is Tanya Whiteleather and I represent C.B., a student afflicted with autism, but who, like so many other students with autism, is a very high-functioning young man who has abilities, skills in many areas that are at or above grade level. In areas typical of kids or students who have autism, C.B. has difficulty, such as in pragmatic or social language skills, reading comprehension and writing, and as of the time of the underlying due process hearing, and currently, C.B. continues to have issues in those areas. However, in math, in other areas, in behavior, he has never had difficulties with those skills, at least in the areas of the time period subject to this hearing. At issue in this matter is C.B.'s right to a faith in the least restrictive environment, the LRE, and the significant and multiple procedural and subjective denials of faith that we allege were committed by his district, Garden Grove Unified School District. C.B. is now 19 and a senior, still attending the University of Chicago, and still providing private services, not in the district's program. I last appeared before this court in 2011, when the court found that Garden Grove had repeatedly denied C.B. a faith. At that point, anxiety had been identified as an issue for him, it continued to be, and at the time of the hearing, the school year at issue, 10-11, that was not addressed by C.B. assessed nor fully and properly identified as part of his IEP. Let me present you with the biggest problem I have with the argument you've presented, and it was identified by the school district in its brief by saying the position being taken in this litigation is directly contradictory to the IEP meetings. And I didn't see that denied in the reply brief, and when I went back to look at the record, that seemed right, that at the time, your client was not seeking placement in general classes, was instead insisting that the boy only learned with individual instruction, wanted one-on-one instruction. Isn't there something inconsistent about those positions? First of all, we have the term continuum in special education. Continuum applies to a large selection of placements. Unfortunately, what was only addressed was full-day general ed classes, which, in my view, was not a good idea. Which Ms. Playa, Barbara Playa, had testified was not appropriate for him, and she expressed that at the IEP. She expressed a lot more than that. She did. She also expressed that he needed to interact with non-disabled typical peers. She said that the boy, this is a quote, requires one-to-one instruction in order to learn. And how the here's the position we have, that does not mean that he cannot be, first of all, a teacher. First of all, let me back up, that does not mean that he cannot be in general education or in a smaller general education class other than a 32-student general education placement for at least part of his school day. LRE does not mean you are either in one-to-one or an SDC or all-day general ed with 30-some students. There is a whole continuum in between that was never, ever discussed. The guardian never said, I will only accept one-to-one. It's not, she never said that. The guardian never said, this is the only thing he could have. Ms. Playa said, yes, he does learn best. What the guardian said, according to a letter written by her attorney, was that the boy only learns with individual instructions as he receives in his present educational setting. And I went through the record, not all of it, it's big, but I didn't see the request for what's been the subject of the appeal, which is that I want him to go into general classes with additional help for some things and so forth. I just don't find that any place. That's not, see, here's where we have a problem, and I think it was our ALJs and I think it was a district court's problem. It's not general ed classes over here, special day class with all the same. Where in the record your client sought what you appear to be seeking on this appeal? Where in the record in the, when she raised it in the due process, when she said it's not appropriate, there were a number of letters regarding the goals. The goals in the 2010, June 2010 IEP indicated they were to allow, if you read through the goals, and I will cite those in a minute, they say they were to allow the student to make progress in general education. She repeatedly asked, and that's in the letters from Mr. Anthony, who spoke for his client, she did not say to anybody that he needs only one-to-one, that he can't learn. So I, and it's not... She said that the boy, quote, only learns with individual instruction as he receives in his present educational setting, close quote. Now, I can draw a distinction between that and what you said, but it's not a big distinction. The problem is that whatever the parent says, whatever, that doesn't mean that denies the district's duty under LRE. But they're trying to, I mean, they're obligated to listen and consider and respond to the parent. So because the parent's busy calling for something over here, I have a hard time with an argument that says he should have been put over here. They're moving in the direction that she seemed to be advocating. They did not. They did not in any way, shape, or form. And the duty of the district is not negated in any way, shape, or form by anything the parent says. The district doesn't get to say, well, the parent said something, and we, so we ignored our duty to discuss LRE. The parent did something else. So we denied, we ignored our duty to create a reading comprehension goal, to address his anxiety, to identify and create goals for anxiety. Whatever the parent said, and the parent liked the one-to-one setting he had at PLEA Speech and Language Center, PSLC. He'd been doing very well. This court had actually reauthorized reimbursement for those services where he had made progress after years and years of not making progress in the general education setting of a full-room class, not a smaller general ed. That was never discussed. And again, I know the parent came with this prejudice toward a program that had helped him make progress. But that doesn't negate whatever she asked for, whatever she didn't ask for. That doesn't excuse the district from having to address, go through the process, what is the least restrictive environment for this student. And that didn't happen. What happened was the district came up and said, actually went outside, the testimony is that four representatives from the district went outside, talked about placement and came back in. The things that were discussed at the IEP were an all-day general ed. placement. The parent had her preference for the one-to-one at PSLC, which had been successful for him, and the district then offered a special day class with all disabled students. No typical peers for a young man whose pragmatic language skills, his social skills in language required that he be around typical peers. There were none. He also had an adaptive, I'm sorry, he had regular physical education. He had been participating in sports for years. The IEP team, the IEP team's assessor had indicated he did not require adaptive PE. He needed to be in regular PE. This particular placement didn't have anything but an adaptive PE class or, as we learned later, a PE class where there were a few peers who were taking gen ed, but we filled in with the teachers at SLDC. And those teachers make up, you don't have a group PE under the state curriculum for physical education. At the June 21st meeting where the IEP plan was presented, the placement offer, the hearing record doesn't indicate that the parent or guardian had much in the way of objections or even much in the way of responses at that particular time. Is it your position that the school district has more of an obligation to draw out a response? It seems that the parent or guardian, I think it's a guardian in this case, their minds seem to be fairly made up about what was desired for CB, but they didn't really engage with the placement offer at that time. Am I missing something? No, I think the reason is that, and it was borne out by the testimony, the district stepped outside, its members, four individuals admitted they stepped outside, they had discussions about placement, and without coming back in, other than, gee, he really couldn't do well in an all day general ed placement, which we have never sought, ever asked for. We are looking for LRE, which was never discussed. It's on the tapes, if you listen to the tapes, which we believe the ALJ did not. If you review the transcripts, there was never a discussion. What other options are there? This young man, particularly, and I'm sorry, I'm getting to your question by a long, circuitous route, this young man could have been in a smaller general education classroom, maybe for part of his day. As Ms. Plea testified, in some classes, not necessarily academic classes, with non-disabled peers, there was no reason. He needed the social interaction. He needed this, and it was LRE for him not to be locked up all day long with kids who were from mild to severely disabled and were not typical, didn't have typical language skills, didn't have all of those things. By the way, this was filed by the district. This was an action by the district. So the reason that the parent did not was this decision was just presented. That's what the record bears out. It was, hi, this is the placement offer. Not, would you like to talk of placements? Do you have, you know, we have these others, would you like to go look at them? And in fact, when this offer was made, the parent, the guardian, then went a few weeks later and said, you know, this is the placement offer. And she went to the district to tour the placement, to look at it, because she hadn't seen it as of the time of this June 21st offer. So being fair and reasonable and open to whatever the district saw, she toured it and saw that the students were included, some severely disabled, in a small classroom, no typical peers. The district was proposing this alternative, or the placement offer, because of the fact that they hadn't seen it. They hadn't seen CB for three years, hadn't observed him. Is that a reasonable position to take, that perhaps for an interim period, they could see whether he could, he was performing fine there and could go on to a more open setting? Not for two specific reasons. One is that the IEP team needs to, the district involved, the local educational agency, has to prepare for the meeting. Come to the meeting, and I'll get to the obstruction issue, but the IEP team needs to prepare for the obstruction issue in a minute. But come to the meeting and say, look, this is what we need. Parent, you are involved. What do you think? What are your concerns? Let's look at the continuum. What is the least restrictive environment based upon the student's needs, anxiety, reading comprehension issues, all of these other things? We have goals. Where can those best be met? And you have to have that discussion with the parent. The district, and I know you're well aware of the timetable, but let me go over it very briefly. First notified in January, we'd like to have an IEP meeting. There were a series of letters going back and forth that were very friendly. I didn't see any problem, no obstructionism, with a guardian saying, well, wait a minute, are IEPs in May? And IEPs are written from year to year with goals to be reviewed in a year's time. If you do them half-time, half-year, you haven't had sufficient time to implement the services. So you wouldn't expect a student to make progress. So you hold them from year to year, and this was actually the subject of a compliance complaint with the State of California that indicated no, you're not going to switch around the annual dates for this particular student with Garden Grove Unified. So the fact that the district had these communications and never, it never asked to assess. It never asked that would be the next step. Hi, we're preparing for an IEP meeting. You know, we need to conduct an assessment. They never did. It was the subject of discussion. It was the subject of a letter from Mr. Anthony, who was a prior attorney. In fact, the guardian said, you know, I'm paying for some assessments by Ms. Plea, credential teacher, reading teacher, director of a non-public agency. Would you like to use those? And the district said yes. Not once, not once in any of their communications did the district say we don't have enough information. They didn't say that. The, at hearing, the district came up and said, oh, now we don't have enough. What we were really doing was we were going to put him somewhere for 30 days, and then do the testing that we were required to do before we made an offer, and then figure out if that was right. That's not what IDEA requires. Well, there was, the presentations made to them included the fact that they didn't have experience with the outside the one-on-one setting. And so I'm not sure what it is they were supposed to have explored or done. I mean, I can think of some things. But among the range of alternatives, I'm not sure why the notion of, well, we want to transition him, but we don't think one step is going to work. So we'll try to transition him through what they proposed, and revisit the question after 30 days. Let me address that. The other issue is that when a student is placed, that placement becomes stapled, if there is an agreement to that. And the IEP was very nebulous. We can revisit, we'll look at him in 30 days, and figure out. Not he's going to be moving somewhere else. So have the guardian said, okay, I'll put him in this, all this information is going to be in this. And if he's disabled, mild to severely disabled placement with no typical pierce whatsoever, there is no guarantee that absent another fight and another hearing, the student was going to be moved or anything was going to be changed in any way. The district had every, not only capability, but it had a duty to make determinations about the student's needs before. They, when they asked, the only time they asked, other than there was a January request for release, the letters back and forth were not ready to do this, and they brought a release to the June 3rd meeting for speech and language only. No release for anything else. The guardian said, sure, here you are. The guardian had PSLC come, participate, provide assessments. Never once, never once did the district say, we don't have enough. Their issue in But on the issue of enough what? The problem was that there was no experience to report in a different setting, wasn't it? Then they needed, they had, what do you do with that, Your Honor? It's very simple. I've attended hundreds of IEP meetings where students are in private placements. Maybe they're in other districts, which can happen in coming in. You don't put a student in something and say, gee, we don't have the opportunity. If you have the opportunity to prepare, to gather information, to do assessments, to do any observations that are necessary, you do that before the IEP. Ginsburg Well, if you were writing our opinion for us, you would say that the district should have, was, should have violated the statute and the requirements by what? By failing first to go through the process of identifying his needs. Anxiety was one. There was no assessment. And this, going back to, again, the last time I appeared before this Court, anxiety has been identified. We finally, although it's not part of the record, it's finally been identified this year. It impinges and impedes his education. But that's part of it. And that has, that affects determinations about what types of classrooms. So that was one. They failed to include a discussion about not just the 30-plus classroom all-day gen ed, but some sort of program where he might be part day in a gen ed. Again, not necessarily an academic, something. And the result of this was that the student was deprived of the education required under the statute, and in that, what? He was in this, and he should have been where? He should have been, well, we don't have the opportunity. I don't know what the district had, because they never came up with a discussion or determination. It was a, here's what we've determined, this is all we have. At hearing, there was a, there was complaint raised or discussion that the parent, I see my red light going on, the parent had not offered anything. It's not the parent's job. This young man did not belong in an all-day disabled class. LRE should have been discussed. And as a result, the parent incurred fees, which is actually the subject of another matter. Isn't your best argument that this was not the least restrictive alternative for making sure that he received the needs, the educational needs that were required? Good morning, Your Honors. May I please the Court? Dan Harbottle for Garden Grove. So was this the least restrictive environment? It was the least restrictive, appropriate environment under the facts of the case, Your Honor. Absolutely, it was. This student had been, since July of 06 or 07, I can't remember which year, in a one-on-one, in a room by himself, with an uncredentialed teacher, getting speech and language services and other services outside of that setting. But the student had been in such a restrictive environment that we, by the way, we brought four high school teachers to the IEPs, both of them. And by the way, they were eight hours long total. So this was a comprehensive counsel on both sides. Everybody had a full and complete opportunity to discuss the matter. But, to answer your question, after three or four years in a setting like that, the psychologists, the speech pathologists, all the district members of the team concluded, and as Your Honor pointed out, that this was not the least restrictive environment. They concluded that a step in the LRE direction, in the more, the less restrictive direction, was the appropriate approach. There was no claim by the parent that anything other than the one-on-one was appropriate. And you saw, if you see the IEP in the ER, it wasn't just at the IEP. There were letter after letter after letter, after the IEP, by student's counsel, demanding the one-on-one placement and saying that it is the only place that he can learn. So, in the face of that, this is one of the ironies here, the participation element is being, we're being, it's claimed that we didn't permit meaningful participation, and yet it was enormous, way more than is typically the case. In fact, going back to the pre-IEP stage, in March, April, and May, as Judge Selma pointed out in great detail, we had sent letters, the district had sent letters to counsel, I guess to the guardian herself and to counsel, saying, he's been at the Pleas Center for this many years, please let us have a release of information to just talk to them, just go there and observe him, speak to his teachers, speak to Ms. Pleas, speak to anyone. And in fact, within 90 days, before the IEP itself, all of those were rejected, they said, come to the IEP and we'll give you our input then. So, in the face of that, there's nothing much you can do, you have to go with the opportunities that are provided to you, but it's not appropriate and it's inconsistent to now claim that they weren't permitted an opportunity to participate in the process. After the fact, letter after letter after letter were exchanged between counsel for the district, of the district itself, and counsel for the student, detailing every potential complaint about the IEP, so participation was enormous in this case. Now, LRE is the big issue here, it clearly is, and this is the appropriate, both the ALJ, who heard six days ago, and the judge Selma, who read the AR and cited to it voluminously, had a significant opportunity to read closing briefs, pointing out the specific parts of the AR that each party felt were appropriately cited to, and then held an extensive oral argument on the process itself. Both of those felt that LRE requirements were met. LRE doesn't mean, and I agree with counsel, it doesn't mean comprehensive high school or home services, or one-on-one services in a room without a credentialed teacher. It means something along that continuum that is appropriate. Is it really a step toward what might be the ultimate goal, the more typical or general high school class? I think the complaint, as I said, is that in a setting which might be smaller than a general high school classroom, but in a setting where all the other students are severely disabled, or at least in some way not what he would like to identify as his peers, is that really a step that goes in the right direction? It is. And every case is fact-specific. So we take a student that's got no peer interaction, virtually none. I think the testimony was that for five minutes during a break, he might run into somebody in the hallway at his then-current placement. But no other peers at all, disabled or otherwise. And conceiving of that as his last three years of educational opportunity, it is absolutely the right step, number one, to get him some goals. Four of the nine goals that were offered were pragmatics goals, social goals. And also keep in mind that I know council wants to characterize that classroom as a severely handicapped classroom, but there were kids in there that were on diploma track. And our recommendation at the IUP was that he be placed on diploma track. Council and guardians said, no, we don't want him to graduate then. We don't want him to graduate at this. We don't think he can graduate at that point. We had four comprehensive high school teachers there to give their input on what they would do when he finally did show up there. And it's a perfectly legitimate step. You don't take a student who's in a highly restrictive hospital environment and throw them directly back into general ed without seeing a some sort of an appropriate transition. Now, it is fact-specific. Some kids can do that. Some kids can't. Given that he needed pragmatic social skill development, the team wrote four, almost half the goals were about socializing him to his environment with trained teachers who know how to do that, with other kids who were also on diploma track, in the classroom that was scheduled for students with those skills. So, in other words, you would agree that there is an obligation, despite what the parents or the guardian said, to do. And that's what the IEP says, to look at the least restrictive environment. There is. But you would argue that that was met here. It is. And that this was, that what you were doing was essentially a transition. That's correct. And that was very clear in the IEP. It was very clear in the OAH case. And it was very clear to Judge Selman, who read the AR. Is it reasonable that there would have been another look after 30 days? Yes, very reasonable. That's the idea. I mean, they were, they knew, this case has been, we've been litigating with these folks for a long time. And so we knew. And might that have resulted in a switch during the school year? It might very well have. In fact, one of the points I kept thinking about as we prepared here was that IEPs are flexible documents. They're not supposed to be static. None of them are supposed to be static. Even those that are not explicitly transitional, IEPs are designed so that if you're, if our goals are too low, we're not going to be able to meet them, and instead of taking a year to meet them, you've met them in six months, then we're under an obligation to call an IEP. If after, even if we don't specify a transition period, if we, after three months, realize student is not doing well in this classroom, we need a different, maybe more restrictive, maybe less restrictive. We've had many, many cases in which the OAH judges have ruled that a general ed placement, having been tried, was inappropriate. For the student, and permitted the district to impose or, you know, offer a slightly more intensive or restrictive setting. So, yes, I think it's a perfectly, it was good to make it explicit in this case, because we knew that the family was resistant to anything other than the one-on-one. And who can ask for such an evaluation? Who can ask? Anyone. The parent can. The parent's attorney can. The team, the private school can. The non-public school can say, CB is doing great, we think he can move to another setting. He's not doing well in this area, but we can write a new goal, or whatever the IEP. Why isn't a placement with moderate to severely disabled students a step back for CB? Well, first of all, it was a placement, it was called a mild-moderate, and I know one of the claims is that it wasn't mild-moderate, there were some moderate to severe kids in there. And the analogy I'd use to you, for you, is that a general education classroom doesn't become a different thing, a different category, just because it has two or three disabled kids in it. It's still a general ed classroom, it just has a different, a range of students. So, from, when you're thinking in terms of restrictiveness, you look at the continuum of options, and the most restrictive that's in the regulations is something like a home hospital. That's what he had. He was taken to this place every day, he had one teacher, four hours a day, and then he had speech and language. He didn't have group setting, there's, look in the IEP notes, the IEP notes say, they're not aware of him having any group activities, other than the sports, in the academic environment for the last several years. So, it isn't a step, in terms of restrictiveness, it's a significant step forward. And in terms of socialization. Well, exactly, I mean, there was no opportunity other than with the teacher and adults in the old settings. So, as a, I mean, the word continuum is the right word, it's not here and here, it's there are all sorts of places along the way that we're able to utilize, and that's why MPS placements exist. Under the law, they have to comply with the IDEA, unlike PSLC, although it did have a certification as a non-public agency to do speech language. But an MPS is there because that alternative does not exist in the public school setting, but they must comply with the IDEA, and they contract with the district as if they are a non-public school. Serving those kids who are appropriately set there. Why wasn't the discussions out in the hallway, which counsel has mentioned today, why doesn't that constitute a lack of a denial of a meaningful opportunity for the guardian to participate? Because it was a break in the IEP, Your Honor. I know it's been characterized as something sinister, but everyone took a break, everyone talked amongst themselves, and this meeting had been planned for months and months and months. It had been initiated in May, finished in June, everybody was talking. There was absolutely no reasonable expectation that the team wouldn't talk. I guarantee you that counsel and her client talked about what they wanted during that break. And the same thing, in fact, the interesting thing about this with the tapes and the transcript, which I think the right decision was made with, was that the part that was played talks about the continuum. Counsel was permitted to play segments of 10 minutes each or a 10-minute segment, and the one she chose to actually play has the discussion, the word continuum, and the discussion of comprehensive high school comes up in that 10-minute segment. So there was no limitation on the ability of the parent. Again, it is important, and I do think counsel is right, that the district has the obligation to make the offer, but it has only an obligation to make an opportunity available to them. And with experienced special education counsel there, before, during, and after, it just stands to reason that they said what they needed to say. As Your Honor said, there was they rejected the IEP at the meeting. There was no going away and thinking about it. The offer was made, the discussion was had, and they rejected the IEP during the course of the meeting. So there was no they obviously had heard everything they needed to hear. If Your Honor said nothing else. Apparently not. We thank you. Give you a minute for rebuttal. And I will keep it very brief, Your Honors. The services that CB got from the nonpublic agency were included from a credentialed teacher. It was a nonpublic agency. The transcripts are huge. They were denied admission. They were, there was a motion made, never ruled on, and they established that there was no discussion of LRE. The offer was for mild to moderate, which I failed to mention. It's in the briefs. This was not a mild to moderate. This was not kids with simple, mild disabilities. This was severely disabled kids, and that was not appropriate for this young man. The explanation about not talking to Ms. Pleo was because there had been a lot of misstatements about things that had been made, and that's ER 1250-51 and 1270, again in the briefs. We are claiming that Ms. Baccariso, the guardian, was not allowed to participate in the discussion about placement. She participated in the rest of the IEP. That's never been denied. The request about high school, at hearing, we want him to get a high school diploma. That was what was presented at hearing. He had always been involved in sports and had peer interaction. He wasn't isolated. And when he came back from CLIA, the district staff reported this as the evidence he'd made great improvement over where he was before. There was no evidence presented in this hearing whatsoever that any of the students were on a diploma track. No evidence whatsoever. Why was this, the placement, suggested a step backward if it was to be for just an interim period and then evaluation to take place? Why was that not appropriate? Because, well, first of all, because there's no guarantee it is an interim. That's the biggest concern. Any placement becomes stay put. And while the question was could somebody ask for a change, we can ask for anything. However, he stays there if the district doesn't agree, and this has been a lifetime of disagreement with the guardian and the student, until we come to hearing and maybe work our way up the chain again to get him moved to less restrictive. You don't put a kid in a more restrictive and then come back. So that's why it wasn't, there's no guarantee that it's going to be a change out in 30 days. The ---- But saying no is a guarantee there's not going to be anything. I'm sorry, Your Honor? Saying no is a guarantee there's not going to be anything. Saying no is a guarantee that he will not be put in an inappropriate placement. Saying yes would mean he would be put in an inappropriate placement. And without parent participation and determination of least restrictive, it's just huge. The mention of continuum, if the transcript is reviewed in the tape, Mr. Harbaugh was the person who said yes, here are the steps, we're supposed to go through the continuum. And then he proceeded to say this is the district's offer. That's the mention of continuum on the tape and in the transcript. The four members testified, as I put in the briefs, they stepped outside, had discussion about potential placements, and then came back in in the district without saying to the parent, let's talk about placements, what could we do, what's LRE, made the decision. So this kept the parent out of that portion of the IEP process. This was a denial of IEP, of LRE, because under 1412A5, removal of children with disabilities from the regular education environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. Satisfactorily. If the interim placement had been accepted and then there was no reevaluation during the course of that school year, could that have been challenged at that point in time, or was the game up by having accepted the IEP? Anything could be challenged. Anything could be challenged. There's no guarantee that he would be receiving appropriate services in the meantime. And this poor kid. He would stay there. He would stay there. That's the problem. Thank you, Your Honor. Thank you. We thank both counsel for your helpful arguments. The case just argued is submitted. That concludes today's argument calendar. We're adjourned.
judges: Tunheim, Schroeder, Clifton